**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**CIVIL ACTION**

**OLUWAROTIMI ODUTOLA,**

Timodutola@gmail.com

9400 Grand BLVD Ste 3547

Largo, MD 20774

Telephone 804-933-8203

Plaintiff,

Case: 1:21-cv-03212 JURY DEMAND
Assigned To : Walton, Reggie B.
Assign. Date : 12/8/2021
Description: Pro Se Gen. Civ. (F-DECK)

**ROBERT P. FLOYD, III (DC 464996)**

**and**

**BRANCH BANKING AND TRUST COMPANY**

Constangy, Brooks, Smith & Prophete, LLP

12500 Fair Lakes Circle, Suite 300

Fairfax, VA 22033

Telephone: 571-522-6109

Facsimile: 571-522-6101

rfloyd@constangy.com

Defendants,

## TABLE OF CONTENTS

INTRODUCTION .......... 5

JURISDICTION .......... 8

PLAINTIFF .......... 8

DEFENDANTS .......... 8

RELEVANT FACTS .......... 8

A. FIRST DEFENDANT IS AN OFFICER OF THE COURT AND HAS A DUTY TO THE COURT, THE CLIENT, THE PUBLIC AND THE OPPOSING PARTY .......... 8

CLAIM FOR RELIEF .......... 11

A. FIRST DEFENDANT BREACHED RULE 3.3 ON CANDOR TO TRIBUNAL .......... 12

B. FIRST DEFENDANT FAILED TO UPHOLD FAIRNESS TO OPPOSING PARTY AND COUNSEL THUS BREACHED RULE 3.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT .......... 12

C. FIRST DEFENDANT'S ACTIONS CONSTITUTE A BREACH OF RULE 4.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT .......... 14

D. FIRST DEFENDANT'S ACTIONS CONSTITUTE A MISCONDUCT AND THUS BREACHED RULE 8.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT .......... 15

PRAYER FOR RELIEF .......... 25

**Statutes**

**Pg.**

D.C. Code §§ 13-422 and 13-423(a) .......... 7

D.C. Code §11-921 and 28-4507 .......... 7

Rule 8.5 of the District of Columbia Rules of Professional Conduct .......... 7

**Regulations**

**Pg.**

District of Columbia Rules of Professional Conduct rule 3.4 .......... 5

District of Columbia Rules of Professional Conduct rule 8.4 .......... 5

**Cases**

**Pg.**

*Hazel-Atlas Glass Co. v. Hartford Empire Co 322 U.S. 238 (1944)* .......................................... 13

*Kupferman v. Consolidated Research & Manufacturing Corp 459 F.2d 1072 (2d Cir. 1972)* .... 13

*Lawyer Disciplinary Board, Petitioner, v. Douglas A. Smoot, Respondent. No. 34724* ............. 12

# COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND OTHER STATUTORY RELIEF

Plaintiff Oluwarotimi Odutola ("Plaintiff"), brings this action against Defendants Robert P. Floyd, III (DC 464996) ("First Defendant") and Branch Banking and Trust Company ("Second Defendant) for Fraud and violations of the District of Columbia Rules of Professional Conduct, rule 3.4 on fairness to opposing party and counsel, rule 3.3 candor to tribunal, rule 4.4 breach of District of Columbia of Professional Conduct. Rule 8.4 on misconduct by the attorney, § 22–3704 of Code of the District of Columbia on Civil action and intentional infliction of emotional distress. In support of his claims, the Plaintiff states as follows:

## INTRODUCTION

1. The first Defendant is an attorney who in a previous case acted for the Second Defendant. This complain arises out the First and Second Defendant's actions in a previous case that prejudiced the Plaintiff in his case for discrimination, retaliation, harassment and hostile work environment. On November 6, 2020, the Honorable Judge Royce C. Lamberth in the case of *Branch Banking and Trust Company v. Oluwarotimi Odutola*, entered a judgment dismissing the case for failure to obey orders and failure to prosecute. The plaintiff subsequently filed a motion for relief from judgment pursuant to Fed. R. Civ. P 60 (b) on or about 10th June, 2021.
2. Plaintiff in the motion for relief of judgement submitted that there were relevant factors which facilitated and ultimately caused the said failure to obey orders and failure to prosecute. The factors among all the others included the Covid-19 pandemic that directly affected Plaintiff, his family and his attorney who was unable to proceed with the case due

to unexpected illnesses. However apart from this reasons, there also others that involved fraud and misrepresentation by the First and Second Defendants in that case.

3. First Defendant and Second Defendant intentionally and disingenuously fabricated the documents presented as exhibits in that case by forging and altering them which had false and fictitious allegations. This was done during the discovery process where the first and second defendant conducted an eleven hour deposition in Washington, D.C. and during the deposition the First Defendant presented several documents to Plaintiff and his counsel as exhibits for Plaintiff to review. The Plaintiff realized that they were fabricated and forged yet they were produced as exhibits (*see exhibits 3,4,5,2)*.

4. Plaintiff immediately refuted the authenticity of each individual exhibit presented by the first and second defendant. The Plaintiff informed the court reporter that he wanted to ensure that it is documented on the record for the courts to know that these documents have been forged, altered and concocted by the first and second defendant. This was deceiving, fraudulent and obstructing the court's ability to fairly rule in Plaintiff's case (*see exhibit 7, 8,9,10,11,12)*

5. Plaintiff took the compromised exhibits to a forensic examiner for review and inspection after the deposition but prior to the court's orders to dismiss his case in November 2020. Plaintiff was not able to get the results back in time before the order on November 6, 2020 due to unexpected and unprecedented pandemic delays beyond anyone's control. Plaintiff was not able to get the results back from the examiner until February 2021. Plaintiff was so infuriated and humiliated by the results he had to get a second opinion from the nations leading handwriting expert Curt Baggett (*see exhibit 1*).

6. When Plaintiff got the results back from the examiner, he was informed that the documents had been altered, forged, fabricated and manipulated by the defendants. Plaintiff recognized and mentioned to the first defendant during the deposition that the handwriting on the documents looked like Keeya Briscoe (*see exhibit 9*).

7. During the deposition the first defendant also presented fabricated and altered video clips as snapshots from the *actual* video footage as exhibits for review *(see exhibit 14).* Once again, Plaintiff immediately identified that the video clips were not from the actual video recording accurately or in their correct chronological sequential order according to the video time stamps. The defendant presented the first video image exhibit with the beginning time of 10:56:04AM and presented the last video exhibit *(see exhibit 28)* with the ending time 10:55:54AM. The page numbering of the video exhibits began from 000493-000507 clearly shows how the defendant methodically and purposely manipulated the sequence of the video images in order to change and distort the true sequence of events intentionally and deceitfully (*see exhibits 14- 28*) while also knowing that the Plaintiff had not seen the actual video footage or been provided the video. Plaintiff and his counsel immediately called into question the authenticity of the exhibits and pointed out the inconsistencies with how the exhibits had been misrepresented and altered previously by means of omitting footages, redacting material evidence and tampering with video evidence *( see exhibit 31-35).*

8. Therefore Plaintiff grounds this complaint on the misconduct of first Defendant as an officer of the court and second Defendant as the client for they colluded to fabricate, commit fraud by forgery and tamper with the evidence adduced by Plaintiff which prejudiced him and obstructed justice to an extent that judgment was entered against him

due to the Defendants actions that denied Plaintiff the ability to fully and equitably litigate his case.

## JURISDICTION

9. This Court has subject matter jurisdiction over this case pursuant to D.C. Code §11-921 and 28-4507. This Court has personal jurisdiction over the parties pursuant to D.C. Code §§ 13-422 and 13-423(a) and Rule 8.5 of the District of Columbia Rules of Professional Conduct that allows the disciplinary authority to hear and determine the dispute in the respective jurisdiction where the conduct occurred and where the lawyer practices.

## PLAINTIFF

10. Plaintiff Oluwarotimi Odutola initiates this suit in the form of a complaint seeking injunctive relief, damages and any other statutory relief that this court may deem fit.

## DEFENDANTS

11. First Defendant Robert P. Floyd, III (DC 464996) is an attorney practicing by way of Constangy, Brooks, Smith & Prophete, LLP located in 12500 Fair Lakes Circle, Suite 300.

12. Second Defendant Branch Banking and Trust Company, is a company that was the client represented by first defendant in the previous suit for which this complaint arises from.

## RELEVANT FACTS

### A. FIRST DEFENDANT IS AN OFFICER OF THE COURT AND HAS A DUTY TO THE COURT, THE CLIENT, THE PUBLIC AND THE OPPOSING PARTY

13. First Defendant Robert P. Floyd, III (DC 464996) is an attorney practicing by way of Constangy, Brooks, Smith & Prophete, LLP located in 12500 Fair Lakes Circle, Suite 300. This means that he is an officer of the court and has a duty to everyone as mentioned and must therefore exercise due diligence and avoid engaging in any actions that might jeopardize his client, the court and the opposing party and thus ultimately obstruct justice.

   **a. First Defendant Breached His Duty to the Court, the Client, the Public and the Opposing Party**

14. First Defendant has violated this duty in collusion with Second Defendant and thus placing Plaintiff at a difficult position where he is prejudiced. As has been submitted, First Defendant and Second Defendant intentionally fabricated documents presented as exhibits in that case by forging and altering them which had false and fictitious allegations to derail the Plaintiffs case. This was done during the discovery process where the first and second defendant conducted an eleven hour deposition in Washington, D.C. and during the deposition the First Defendant presented several documents to Plaintiff and his counsel as exhibits for Plaintiff to review.

15. Plaintiff took the compromised exhibits to a forensic examiner for review and inspection after the deposition but prior to the court's orders to dismiss his case in November 2020. Plaintiff was not able to get the results back in time before the order on November 6, 2020 due to unexpected and unprecedented pandemic related delays beyond anyone's control. Plaintiff was not able to get the results back from the examiner until February 2021.

16. When Plaintiff got the results back from the examiner, he was informed that the documents had been altered, forged, fabricated and manipulated by the defendants. The handwriting on the documents that committed the forgery and alteration looked like the same

handwriting as the second defendant's manager Keeya Briscoe. Plaintiff recognized and mentioned to the first defendant during the deposition that the handwriting on the documents looked like Keeya Briscoe (*see exh. 9)*

17. The first defendant and second defendant demonstrated discovery abuse throughout the discovery process by means of fraud, forgery, intentional misrepresentation and misconduct. The defendants engaged in misconduct that severely prejudiced Plaintiff's case during the discovery process in several ways. In November 2018, Plaintiff sent the defendants a letter of preservation of electronic information through certified mail to notify the defendants to preserve all relevant documents and information pertaining to this case in their *original* copy. Particularly, the video footage that was recorded and saved by the Defendant from the date of the incident at the bank. Considering how important and critical that evidence is to this case and to prove the allegations.

18. The defendant had previously provided the actual video footage to the District of Columbia police department detective Bemiller prior to the letter from the Plaintiff.

19. The defendants were completely aware of the civil lawsuit brought against them two years prior and are completely knowledgeable of the nuances of preserving material evidence for the purposes of litigation. Jackie Meier, Plaintiff previous counsel, had requested the same video footage that the Defendant previously provided to law enforcement in the Plaintiffs request for production of documents during the beginning of the discovery stage to be used before the defendant's scheduled deposition and as material evidence during discovery.

20. The defendant purposely withheld the video tape and did not provide the video tape in their responses to our request for production of documents but instead provided a few selected

video images stills instead that had been tampered and altered. Completely derailing his attorney's ability to fully and equitably litigate the case entirely. Upon obtaining his counsel Mr. Rudasil, during the deposition the first defendant Robert Floyd repeatedly lied under oath stating that the video footage did not exist and he does not know what happened to it and he only had a few snapshots from the actual video. The first defendant then presented the Plaintiff with a series of video clips as exhibits that had been redacted, altered and had changed time sequences of the events in video footage *(see exh. 30-35, 14-28).*

21. Redacted most of the footage and doctored the video snapshots to deceive and manipulate the authenticity of the original video footage sequence of events. Plaintiff and his counsel immediately identified the deceptive scheme the defendants counsel tried to carry out and called in to question the defendant's counsel scheme immediately on the record. The first defendant's attorney Robert Floyd after being caught, even agreed after the Plaintiff counsel vividly demonstrated how the exhibits were changed out of chronological order *(see exh 31-33).* Plaintiff repeatedly asked the defendants counsel for the actual video footage because it was obvious that the majority of the footage had been redacted to suit the defendant's scheme. The first defendant kept lying on the record, saying that he did not know if there was a video tape even though he was using video clips from the *actual* video footage as exhibits during the deposition.

## CLAIM FOR RELIEF

**(District of Columbia Rules of Professional Conduct, rule 3.3 on Candor to Tribunal, rule 3.4 on fairness to opposing party and counsel, rule 4.4 on respect for rights of third persons and rule 8.4 on misconduct by the attorney)**

22. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 21, above, as if fully set forth herein.

## A. FIRST DEFENDANT BREACHED RULE 3.3 ON CANDOR TO TRIBUNAL

23. The First Defendant breached rule 3.3 of District of Columbia Rules of Professional Conduct on Candor to Tribunal. Rule 3.3 provides that (a) A lawyer shall not knowingly (4) Offer evidence that the lawyer knows to be false.

24. First Defendant breached this rule by tampering with the evidence and offering evidence knowing it to be misrepresented and distorted. In an attempt to equivocate the truth while lying to conceal and justify their misconduct. Deliberately perpetuating fraud by means of forgery and fabrication willfully, thus failed to uphold and maintain candor to the court.

## B. FIRST DEFENDANT FAILED TO UPHOLD FAIRNESS TO OPPOSING PARTY AND COUNSEL THUS BREACHED RULE 3.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT

25. The First Defendant breached rule 3.4 of District of Columbia Rules of Professional Conduct on failing to show fairness to opposing party and counsel. Rule 3.4 of District of Columbia Rules of Professional Conduct provides that A lawyer shall not:

a.   Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;

b.   Falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

26. In the present case, the first defendant failed to uphold this duty and unlawfully obstructed Plaintiff's access to evidence and unlawfully altered, and concealed a document having potential evidentiary value. The first Defendant tampered with evidence by intentionally presenting certain selected video image stills from the actual video footage. Which misrepresented that actual sequence of events by purposely switching the images chronological order according of the video time stamps from later to earlier to deceive and distort the video.   The first defendant also redacted and purposely omitted the remaining images in order to hide and conceal the true sequence of events in order to deceptively disprove the Plaintiffs testimony while purporting their false narrative. The defendant did not *accidentally* take selected video images off a twelve minute video recording and then mistakenly present the images out of chronological order. Especially since the purpose of the video evidence was to depict the true sequence of events that occurred on that day in order to corroborate the Plaintiffs testimony. This is by no means an accident or mistake, because the Plaintiff and Plaintiffs' counsel had not previously seen the actual video footage prior to the depositon. The first defendant and second defendant both had possession of the video and have seen the actual video footage. Therefore the defendants both knew without a shadow of a doubt the true sequence of events; and that's why they had to tamper with and alter the video evidence and had to purposely withheld the video

from the Plaintiff by only providing altered snap shots video images as exhibits instead of the actual video footage. The Plaintiff and Plaintiffs counsel relied solely on those exhibits presented by the defendant in absence of the actual video. The defendants demonstrated misconduct by exploiting that opportunity willfully, deceitfully and by discovery abuse. Had the Plaintiff been provided with the video footage as previously request during discovery and before the deposition, the defendants would not have been able to misrepresent the video images or alter them. The defendant also falsified and altered evidence as submitted by the allegations from paragraph 1 to 22 of this complaint by forging, altering and fraudulent misrepresentation *(see exhibit 1)*. The Plaintiff thus claims for relief from this breach that has obstructed his justice. *In Lawyer Disciplinary Board, Petitioner, v. Douglas A. Smoot, Respondent. No. 34724.* The court held that a lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully *alter*, destroy or *conceal* a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act. The defendant engaged in misconduct by improperly withholding video material having evidentiary value and fraud which conduct consequently had a significant prejudice effect on the legal proceeding.

## C.  FIRST DEFENDANT'S ACTIONS CONSTITUTE A BREACH OF RULE 4.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT

27. The First Defendant breached rule 4.4 of District of Columbia Rules of Professional on Respect for Rights of Third Persons. Rule 4.4 provides that in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay,

or burden a third person, or knowingly use methods of obtaining evidence that violate the legal rights of such a person.

28. The First Defendant through their misconduct and extrinsic fraud in fabricating evidence, providing false and misleading statements and withholding evidence violated this rule. The first defendant and the second defendant are both complicit by purposely withholding evidence which is considered bad faith litigation, lying under oath repeatedly by subverting the truth and compromising the integrity of the discovery process. Embarrassing and burdening the Plaintiff by concocting fabricated, forged and misrepresented documents to compromise and destroy the Plaintiffs credibility and testimony. The first and second defendant also violated the legal rights of the Plaintiff by illegally tampering with physical evidence and illegally forging multiple documents to embarrass, humiliate and denigrate the Plaintiff by derailing and delaying his case. Inflicting a huge burden on the Plaintiff financially, mentally, emotionally and psychologically. Delaying the discovery process and derailing the case due to the Plaintiff having to utilize due diligence to prove the truth and expose the defendants heinous misconduct which caused huge delays and time. Therefore first defendant being an officer of the court clearly breached this rule which violated the rights of the Plaintiff.

**D. FIRST DEFENDANT'S ACTIONS CONSTITUTE A MISCONDUCT AND THUS BREACHED RULE 8.4 OF DISTRICT OF COLUMBIA RULES OF PROFESSIONAL CONDUCT**

29. Rule 8.4 of District of Columbia Rules of Professional Conduct provides that It is professional misconduct for a lawyer to:

a. Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through *the acts of another*.

b. Commit a *criminal act* that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

c. Engage in conduct involving *dishonesty, fraud, deceit or misrepresentation*;

d. Engage in conduct that is *prejudicial to the administration of justice*;

*30.* The First Defendant violated Rules of Professional Conduct in collusion with second defendant by tampering with evidence and thus obstructing justice. The First Defendant violated the Rules of Professional Conduct knowingly, assisted and through the acts of the second defendant by presenting fraudulent exhibits that were proven to be forged and altered as authentic. While also presenting and misrepresenting altered video image stills to distort the facts. The first defendant used persuasive deceptive rhetoric and cunning gamesmanship to convince and mislead the Plaintiff into believing the exhibits were not fraudulent when in fact the defendant knew they were. The first defendant also violated the rules by committing and willfully facilitating a criminal act of forgery, fraud and tampering with evidence in collusion with Second Defendant. The first defendant candidly exemplified in full display dishonesty, fraud, deceit and misrepresentation which was not only prejudicial to the administration of justice but caused severe mental anguish and further exacerbated the psychological side effects of PTSD previously caused by the second defendant. The first defendant proceeded to make their case knowing very well that they had engaged in dishonesty, fraud, deceit and misrepresentation. In *Hazel-Atlas Glass Co. v. Hartford Empire Co 322 U.S. 238 (1944),* the court stated that

*Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.*

31. In *Kupferman v. Consolidated Research & Manufacturing Corp 459 F.2d 1072 (2d Cir. 1972),* the court stated that while an attorney "should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court." And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.

32. The first defendant Robert Floyd candidly mentioned in their Opposition To The Plaintiffs Motion For Relief From Judgement. That, *the Plaintiff makes numerous false claims of fraud, misrepresentation, fabrication or alteration and/or forgery against Defendant and Defendants counsel. Despite the false and outrageous nature of Plaintiff allegations, he also failed to provide a single supporting affidavit (see exhibit 50). Reference to;(see exhibit 1)*

33. The defendants counsel also boldly made assertions in their opposition motion stating, *These serious and false allegations are all without a single shred of evidence or other*

*support beyond Plaintiffs on speculation, conspiracy theories and conjecture (see exhibit 50).*

34. These cynical and mendacious comments demonstrate how willingly and blatantly the defendant is willing to lie to the courts and in order to undermine the courts integrity to fairly rule on this case while the Defendant willing and continually obstructs the judicial process with false statements to undermine the courts. Further questioning his trustworthiness and fitness as an attorney in this case.

35. The defendants have clearly demonstrated misconduct and extrinsic fraud by fabricating evidence, providing false and misleading statements and withholding evidence. The first defendant and the second defendant are both complicit by purposely withholding evidence which is considered bad faith litigation, lying under oath repeatedly to the Plaintiff by subverting the truth and compromising the integrity of the discovery process.

36. The defendants have thus demonstrated misrepresentation and fraud by committing fraud on the basis of knowingly providing false statements, forged and altered documents to the courts with the intent to deceive and derail this case.

37. The above-described acts and practices of Defendants have prejudiced and will likely continue to prejudice the Plaintiff as they have caused mental anguish and distress for the Plaintiff including resources and costs deployed to unearth their misconduct that obstructs justice.

38. Unless the Defendants are made to pay for their misconduct and restricted from engaging further in the acts and practices complained of herein, the continued activities of the Defendants will result in irreparable injury to the Plaintiff for which there is no adequate remedy at law. The Defendants' illegal actions of tampering with evidence and engaging

in fraudulent acts and misrepresentation, violates his rights as protected by the law and the need for justice for all.

**E. DEFENDANTS COMMITTED FRAUD THROUGH FRAUDULENT MISREPRESENTATIONS**

39. The defendants committed extrinsic fraud by fabricating evidence, providing false and misleading statements and withholding evidence. The defendants are both complicit by purposely withholding evidence which is considered bad faith litigation, lying under oath repeatedly by subverting the truth and compromising the integrity of the discovery process.

40. The defendants have committed fraudulent misrepresentation on the basis of knowingly providing false, forged and altered documents to the courts with the intent to deceive and obstruct the judicial process. The defendants knowingly made several false statements in reference to the video material facts and forged exhibits with the intention of deceiving the Plaintiff. The Plaintiff took action in reasonable reliance upon the statements by the defendants and therefore suffered multiple damages legally, financially and psychologically. The examiners report by Curt Baggett shows by clear and convincing evidence that the exhibits were forged, altered and fabricated and the defendant knowingly made several intentional false statements to subvert the truth *( see exhibit 7, line 10; exhibit 8, line 12-13; exhibit 12, line 2-3)*. The video tape footage provided to the Plaintiff by the Freedom Information Act FOIA after the deposition shows the true sequence of events and clearly and convincingly proves that the defendant continued to make false statements regarding the video exhibits and fraudulently misrepresented them *(see exhibit 40-42), (see exhibit 30-35).*

41. The defendants heinous actions and deliberate misconduct caused untimely delays in order to uncover their deceit and prevented the Plaintiff and Plaintiffs attorney from presenting my case fully and fairly. Thus, spending time and resources to uncover the fraud which prevented the Plaintiff from reaching a fair and just settlement offer during negotiations. Completing discovery in a timely manner without having to get expert witnesses during a pandemic. Plaintiff had to recuse his previous counsel Jackie Meier which costed him time and huge financial costs hindering him from properly financing his case with his present attorney and paying personal expenses. The Plaintiffs attorney granted the defendant time to take a break from the case to deal with a family loss which was preventing the defendants counsel Robert Floyd from working the case due to the emotional toll he faced. Plaintiff would have not granted the defendants counsel a break but instead would have motioned for sanctions to be granted by default summary judgement based on bad faith litigation for forgery, fraud and misconduct.

42. To plead a claim of fraud under District of Columbia law, a plaintiff must plead that: The defendant made: – a false statement of material fact; – with knowledge of its falsity; and – with the intent to deceive. The plaintiff: – relied on the representation; and – suffered damages. (Chedick v. Nash, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (applying District of Columbia law); In re U.S. Off. Prods. Co. Sec. Litig., 251 F. Supp. 2d 77, 100 (D.D.C. 2003) (applying District of Columbia law); Hercules & Co. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992).).

43. The defendants knowingly provided false and altered documents to the courts with the intent to deceive and obstruct the judicial process. This amounts to fraud. A material misrepresentation actionable in fraud must be consciously false and intended to mislead

another (Sarete, Inc. v. 1344 U St. Ltd. P'ship, 871 A.2d 480, 493 (D.C. 2005)). A literally true statement that creates a false impression can be actionable in fraud (Jacobson v. Hofgard, 168 F. Supp. 3d 187, 196 (D.D.C. 2016) (applying District of Columbia law); Remeikis v. Boss & Phelps, Inc., 419 A.2d 986, 989 (D.C. 1980); Restatement (Second) of Torts § 529). The defendants knowingly intended to mislead the court by tampering with evidence and fabricating evidence and thus this prejudiced Plaintiff.

44. To satisfy the reliance element of fraud in the District of Columbia, a plaintiff must plead with particularity which statements the plaintiff relied upon and which actions it took in response. The plaintiff's reliance must be a substantial factor in the injury suffered. (Parr v. Ebrahimian, 70 F. Supp. 3d 123, 129 (D.D.C. 2014) (applying District of Columbia law); Wu v. Stomber, 883 F. Supp. 2d 233, 273 (D.D.C. 2012) (applying District of Columbia law); Stancil v. First Mount Vernon Indus. Loan Ass'n, 131 A.3d 867, 876 (D.C. 2014).). The Plaintiff and Plaintiffs attorney in this case relied on the fabricated forged evidence and most importantly the misrepresented video exhibits. Causing extreme delays, distortion of material facts and derailed the legal process causing irreparable damages to the Plaintiff. The defendants knowingly attempted to obstruct the justice process by fraud and misrepresentation .

## F. DEFENDANTS INTENTIONALLY INFLICTED EMOTIONAL DISTRESS UPON PLAINTIFF

45. The Defendants through their actions of fraudulent misrepresentation and tampering of evidence placed Plaintiff in a prejudiced situation that caused financial losses, emotional losses and mental distress. The Plaintiff had to suffer the consequences of Defendants

intentionally trying to hijack the justice process by altering and tampering of evidence and further fabricating available evidence to distort the whole situation at the expense of the Plaintiff. A claim for intentional infliction of emotional distress requires that a person subjected another person to extreme and outrageous conduct and that such conduct intentionally or recklessly caused the other person to suffer severe emotional distress.

46. The Code of the District of Columbia, § 22–3704. Civil action, stipulates that Irrespective of any criminal prosecution or the result of a criminal prosecution, any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice…designated act shall have a civil cause of action in a court of competent jurisdiction for appropriate relief, which includes: Actual or nominal damages for economic or non-economic loss, including damages for emotional distress; Punitive damages in an amount to be determined by a jury or a court sitting without a jury; or Reasonable attorneys' fees and costs. The defendants intentionally engaged in acts that inflicted emotional distress on the Plaintiff as tampering with evidence and obstructing the process of justice was tedious for the Plaintiff as he had to fight to overcome the adversity brought by prejudice caused by Defendants' actions. Therefore Plaintiff claims damages for intentional infliction of emotional stress by Defendants.

47. The first defendant and second defendant subjected the the Plaintiff to extreme and outrageous misconduct leading up to and during the deposition. First, the second defendant and manager Keeya Briscoe horrendous actions of discrimination, harassment, retaliation, hostile work environment and receiving a death threat on the job were what initially brought about the lawsuit in 2018. The harassment from his manager and the death threat on the job is what led to the Plaintiff being diagnosed with PTSD *(see exhibit 52-55)*. The

Defendant also violated Rule 30 (d) (1) which states that a deposition is limited to 1 day and 7 hours. The defendant conducted an eleven hour grueling deposition that was designed to embarrass and undermine the Plaintiff character using unscrupulous and unethical tactics. The first defendant and second defendant subjected the Plaintiff to extreme and outrageous conduct by illegally forging his signature, initials and altering dates on multiple exhibits concocted for the purpose of humiliating, insulting and undermining his credibility in the case. The Plaintiff vehemently called into question each fraudulent exhibit that the defendant presented and pointed out that they were forged, altered and fabricated. {see 1,2,3} The defendant constantly made false statements to downplay the serious nature of the fraud in a cynical fashion in order to push their narrative. The defendant was not aware that the Plaintiff would later have the exhibits examined by a forensic examiner to prove the fraud. The first and second defendants misconduct was not only illegal and offensive but extremely egregious and detrimental to the Plaintiffs pursuit for justice. The fabricated documents and the misrepresentation of the video images were so detrimental to the Plaintiff, that it caused distrust and issues for the Plaintiffs first attorney Jackie Meier to the extent that she had to be recused by the Plaintiff for irreconcilable differences in he middle of the case *( see exhibit 57).* This caused a huge financial burden on the Plaintiff being that he was paying out of pocket by the hour and already spent twenty-two thousand dollars. The Plaintiff ended up getting sued by Jackie Meier for an additional nine thousand which totaled over thirty thousand dollars due to the misconduct by the defendant. The Plaintiffs second attorney James Rudasil had a more difficult time fully and properly litigating the case due to the deceitful scheme facilitated by the defendant which distorted and obstructed the facts of the case during the deposition.

48. To make matter worse, the defendant demonstrated the most egregious act by knowingly and intentionally misrepresenting the video image stills taken from the actual video footage. Once again, the defendant obstructed the discovery process by illegally tampering with physical material evidence and presenting them as exhibits. This is extreme and outrageous conduct because the video footage was pertinent material evidence in this case. Being that, the Plaintiff and Plaintiffs attorney James Rudasil had not yet had a chance to see the actual video footage prior to the deposition because the defendant refused to provide it to them. The only recollection of the sequence of events the Plaintiff had were the video clips the defendant doctored and fabricated and his own testimony. The defendant meticulously selected specific video images from the video that they wanted to show while redacting and omitting the rest of the video images in order to obstruct and depict their narrative of sequence of events. Lastly, the defendant disingenuously switched the chronological order of the video images according to the time stamps on the video images from later to beginning to portray an inaccurate sequence of events contrary to the actual video footage and testimony of the Plaintiff.

49. The deposition was humiliating and frustrating which caused the Plaintiff extreme burden financially, psychologically and legally. The Plaintiff already was diagnosed with PTSD due to the incidents that happened to him caused by the second defendant for harassment, retaliation, discrimination and hostile work environment. Not to mention, the perpetrator that threatened to kill him on the job which brought about the civil suit *(see exhibit 52).* The first defendants outrageous conduct further exacerbated the symptoms of PTSD, inability to sleep, anxiety, hopelessness, emotional trauma and mental anguish. The financial legal burden caused the Plaintiff to be displaced due to not being able to pay rent

due to being sued and the enormous legal costs associated. The Plaintiff continues to suffer from the defendant actions and is affected in all facets of his life including his current employment and everyday life up until this very moment causing him having to go on disability leave for several months at a time in order to cope.  The first and second defendants conduct was very egregious and no person would consider it acceptable in society.

## PRAYER FOR RELIEF

50. Plaintiff respectfully requests that this Court, as authorized by statute and its own equitable powers, enter final judgment against Defendants and:

   a. Adjudge and decree that Defendant's actions constitute unfairness to opposing party and counsel and misconduct in violation of the District of Columbia Rules of Professional Conduct, rule 3.3 on Candor to Tribunal, rule 3.4 on fairness to opposing party and counsel, rule 4.4 on respect for rights of third persons and counsel and rule 8.4 on misconduct by the attorney.

   b. Adjudge and decree that the Defendants acted in a manner that obstructs justice

   c. As needed, enter such relief to remove any ability of the Defendants to harm other parties by disadvantaging them due to their misconduct and tampering of evidence, including but not limited to structural relief as well as effective, monitorable, and measurable conduct remedies that eliminate the ability of

Defendants to continue to engage in further misconduct that obstructs justice.

d.  For compensatory damages for all damages sustained as a result of Defendants' wrongdoing and imputed wrongdoing (including, inter alia, all expenses utilized, pain, mental suffering, mental anguish etc.), in total amount of $47,000,000 (forty-seven million dollars) to be proven at trial, plus interest thereon;

e.  For punitive damages in an amount to be determined at trial;

f.  For interest compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

g.  Award to Plaintiff any other equitable relief as the Court finds appropriate to redress Defendants' violations of the laws specified above.

Dated:12-07-2021

Respectfully submitted

Oluwarotimi Odutola

9400 Grand BLVD Ste 3547

Largo, MD 20774

Telephone 804-933-8203

**CERTIFICATE OF SERIVCE**

I CERTIFIY that on December 7, 2021, the Complaint was served to the defendant at the following address by United States mail, postage

Robert Floyd
Constangy, Brooks, Smith & Prophete, LLP
12500 Fair Lakes Circle, Suite 300
Fairfax, VA 22033

Constangy, Brooks, Smith & Prophete, LLP
C T Corporation System
4701 Cox RD Ste 285
Glen Allen, VA 23060

Branch Banking & Trust Company
Truist Investment Services
1090 Vermont Avenue NW
Washington, DC 20005

Oluwarotimi Odutola
9400 Grand BLVD Ste 3547
Largo, MD 20774
Telephone 804-933-8203

5/21
(O.M.O)
Forged date & Keeya Briscoe handwriting
☆ Keeya Briscoe ☆
Forger's handwriting
(please match with the other two exhibits)
11/6/2015

## Branch Expectations

1. Vacation should be given 3 weeks in advance. Subject to management approval and AOO approval.

2. Doctor visits should be given 3weeks in advance with adequate staffing. Mondays and Fridays, no appointments should be scheduled, if at all possible. Subject to management approval.

3. If you are going to be late please text or call management no later than 15 min before scheduled time.

4. If you are sick please call management after 7:00 am or an hour before your start time. Please ensure that ALL duties have been communicated to the proper person.

5. If you need to leave early or come in late, please notify manager as soon as possible, even if management is not in the office. This will be subject to management approval. If possible, please find coverage. This will be your responsibility.

↑ 5/21
photocopied (O.M.O)

Depo # 3

# Progress Update Sheet

(based on steps of formal coaching)

Printed date (O.M.O) 5/21

**Name: Tim Odutola** **Date: 03/07/2016**

**Progress and follow up on action plan since last session**: (step 2)

This is a verbal warning. On 11/06/2015, it was communicated to Tim that if an associate was sick, they would need to call management after 7:00am or an hour before there start time and let management know the situation. However, on 03/07/2016 Tim texted ML at 5:10am and said that he was sick and was not coming in. Tim did not follow the proper procedures as to notify management.

**Focus Area**: (step 4)

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Going forward Tim should **call** management after 7:00am or an hour before start time and inform management of illness. If Tim fails to do so, this could result in an unexcused absence.

**Create Action Plan** : (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.:

Going forward Tim should follow the procedures of the branch and BB&T. It is not acceptable to send a text to your ML stating that you are sick. The proper procedure is to call management and if needed, discuss any arrangements with associates and clients that might need to take place.

☆ Keeya Briscoe ☆
The forger's handwriting
(please match the two)

Altered date

photocopied (O.M.O)

(Initials) Mgr. KB Empl. ______ Date 3/8/16. TO

(O.M.O) Keeya Briscoe handwriting 5/21

(O.M.O) 5/21 Forged date and altered 6 to an 8 to match print date — Keeya Briscoe handwriting.

Depo #10

Odutola v. BB&T 000262 CONFIDENTIAL

EXHIBIT #5

O.M.O Odutola signature

# Progress Update Sheet

(based on steps of formal coaching)

Printed date (O.M.O) 5/21

**Name: Tim Odutola** **Date: 03/8/2016**

**Progress and follow up on action plan since last session**: (step 2)

Branch Bankers are responsible for attending training classes and completing their Computer-based training. These CBT have to be completed before the due date. You have 30 days to complete them. Tim has been asked on several occasions to complete the CBT's on time. Tim has allowed many of his CBT's to become overdue more than 30 days. CBTs must be completed on time for compliance purposes.

**Focus Area for month**: (step 4)

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Every month when Tim receives notification of CBTs. Tim should complete all courses before the due date.

**Create Action Plan for month**: (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.

On a monthly basis, CBT courses should be completed on time. If courses are not completed on time, Tim should have a conversation with the ML and an action plan.

*Keeya Briscoe* The forger's handwriting (please match the two)

5/21 O.M.O. Keya Briscoe handwriting — the same

5/21 (Altered date from 6 to 8.) Forged date to match (O.M.O) printed date

[Coach's Support]

(Initials) Mgr. ________ Empl. KB Date 3/8/16

5/21 (O.M.O) Forged by Keeya Briscoe

Depo Ex 11

# Progress Update Sheet

**Name: Tim Odutola** **Date: 06/15/2016**

**Progress and follow up on action plan since last session**: (step 2)

New accounts should not be opened for clients that have charge-off accounts with us. If the client would like to open a new account they must pay off their charge-off and the associate must obtain approval from an AOO team lead before proceeding with new account opening. If the new account is approved then the associate must put notes in the system.

**Focus Area for month**:

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Charge-off accounts are a risk to the bank. So, operations has put this in place to that there will not be additional loss. You have not followed this procedure, so going forward you must follow the steps above.

**Create Action Plan for month**: (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.:

Consistently, follow the steps above.

[Coach's Support]

__If you need any assistance determining an account is charge-off, please consultant your ML, AOO or the BB IV.

(Initials) Mgr. KB Empl. ________ Date 6-15-16

Odutola v. BB&T
000239
CONFIDENTIAL

Depo 15

* fabricated and made up.
* NO signature and never seen document before



EXHIBIT #1

(MB) A Somebody forged this date, so I can't -- I believe it was --
(DEF) Q How do you know it was forged?
(ME) A Because that's not my signature.
(DEF) Q But nobody is saying it's your signature. I'm not saying it's your signature.
(ME) A But that -- that -- I mean, not the signature. That date, that's not my handwriting so that can't correlate with my signature. I can't --
(DEF) Q So the fact that that date wasn't written by you you're saying makes it inconsistent that it was signed on that date?
(ME) A Absolutely. I don't know this could have been a policy from 2012. I don't know. I can't attest to that. That's not my signature. And I would like that to go on record.
Q That's not your --
A No. I mean, it's my signature, but that's not my handwriting for the date. So then, also, I would like to see the original copy of this because this is a photo copy. You can forge a signature. BB&T has been very inconsistent with a lot of

[Handwritten margin notes: "knowingly deceiving intentionally"; "That is considered FRAUD fabrication, alteration of document."; "Important!!"; "Def did in fact forge the document Criminal & Civil"]

here. I'm not sure exactly. They are -- I'll represent to you that these -- this is a copy of the associate handbook with representative pages that I'll discuss with you. Take your time.

A I just missed what you were saying. So I just -- I can't -- what did you just say?

(DEF) Q What do you have an issue with?

(ME) A That really bothers me that they would have a date on there that I didn't sign. I don't understand why somebody else is putting a date on a document.

(Defendant is complicit)

(DEF) Q Why is that a -- what's wrong with that? Tell me why you think something is wrong with that?

(ME) A Because if -- because if you sign something -- first of all, if you look at all the documents that I've signed, I'm sure you can see that my signature and the date is consistent. The fact that this is a photocopy and then my signature is placed there -- yes, that is my signature, but I don't know if it's my signature for this document.

And then that's not my handwriting for that date. That's inconsistent. And that leads me to

perpetuating facilitating FRAUD by Defendant.

misconduct by defendant by altering and fabricating exhibits



EXHIBIT # 9

Q And so this was another verbal warning?

A Yeah. I remember us having a discussion about this, but I don't recall signing this.

Q Okay. But you said that is your signature?

A That's my signature, but I would have signed on the line just as consistent with the -- all the other documents I signed.

Q Okay.

(ME) A Again, I don't understand why -- first of all, I don't put a circle around my signature like that. Why would I -- I wouldn't sign over here. She was a stickler about these things about signing and dating. She was very -- and again, that's also not my -- again, as you can see, this is not my -- that's not my handwriting as far as with the date. That's her -- that's Keeya's, and it looks like she altered it. Looks like a 3/8 -- looks like it was a six and she made it into an eight.

Altering ... is ..., misconduct

(DEF) Q She is talking about a situation that occurred on March 7th, right?

(ME) A Yeah. But you can clearly see that it was a * six and she altered it so it would be an eight. *

* "Forgery" by the defendant
* "Altering" documents by the defendant



Exhibit 10

(DEF) Q Right. For some suspicious reason, are you suggesting?
(ME) A I don't recall signing this document.
Q But you recall a situation --
A I recall her speaking to me about it, and she said it wasn't a big issue because I text you at 5 a.m. --
Q So you got a verbal warning?
A She didn't tell me I was getting a verbal warning.
(DEF) Q You got a verbal warning. It's sitting in front of you. ← misleading and presenting fabricated document to deceive
(ME) A I see. But I never saw this document.
(DEF) Q Well, your signature is on it?
(ME) A Yeah. And also there's a date on here.
(DEF) Q Okay.
(ME) A Fine.
(DEF) Q Your signature is on the document? ← Deceiving, misleading statements knowingly to be false...
(ME) A I didn't put it there.
(DEF) Q You didn't put that signature on there?
(ME) A No. Just like that date is not mine either.
(DEF) Q That's fine, the date is not yours. But the

* "Forgery" by defendant "FRAUD"


Exhibit 14

(DEF) signature, it looks exactly like the signature on the last one.

(ME) A No. The last one doesn't have a circle around it. This one has a circle around it. ← "Forged"

Q If we find another one with a circle around it, you would concede that's your signature?

(ME) A I -- it depends. But I did not sign over here. She was -- Keeya was a stickler -- she was very tactful. I will say that. She was a stickler about signing on things and dating. That's not my signature and that's an altered date. – Def forged both signature and date FRAUD

(Exhibit 11 was marked for identification and is attached to the transcript.)

(DEF) Q I've handed you what's been marked as Exhibit 11, progress update sheet, dated March 8th. Let me know when you've had a chance to review it. Do you recognize this document?

making false document, fabricated with intent to deceive.

(ME) A No, I do not.

(DEF) Q Is that not your signature on the bottom?

(ME) A That's her signature in the employee's -- where the employee is supposed to sign; and again, that's not my handwriting. ★ Fabricated multiple document ↖ Def.

* "Fabricated" false documents by defendant



(ME) A It's altered. That's not an 8. That's a 6.
(DEF) Q Okay. Well, it looks like an 8 to me, and it says 8 at the top, correct?
(ME) A She changed it.
(DEF) Q Does it say 8 on the top?
(ME) A It may say it on the top, but this is an altered -- that's an altered date and anybody could --
(DEF) Q Even if it's March 6th -- let's say it's March 6th since that seems to be important to you, had you completed your training by March 6th?
A Yes, I believe so.
Q You believe so or you did?
A Yes, I did.
Q So why would she send this to you?
A This was sent out on March the 1st. This stating that I didn't completely training was sent out on March the 1st. And this it -- this progress write-up is on March the 6th.
Q Well, her email to you is per our conversation all past due CBT should be completed; and that's dated March 2nd, then, right?

DEF is lying subverting the truth. Making statement he knows to be false.
Document was altered forged

Bad faith litigation.

***Handwriting Expert, LLC***
***Curt Baggett***
Expert Document Examiner
533 Park Lane
Richardson, Texas 75081
Phone: 972.644.0285
cbhandwriting@gmail.com
**www.ExpertDocumentExaminer.com**

---

**Questioned Document Examiner Letter**

Subject: **Tim Odutola**
Date: September 23, 2021

I have examined five (5) documents with the known initials and signatures of Tim Odutola. For the purpose of this examination I have labeled these exhibits 'K1' through 'K5'.

Today I have compared the initials and signatures of Tim Odutola on the 'K' documents to the Tim Odutola signature, handwritten dates and initials on the questioned documents, identified herein as **'Q1' through 'Q4'**, to determine if the author of the Tim Odutola initials and signatures on the 'K' documents was the same person who authored the name of Tim Odutola, the 2 handwritten dates and the initials of Tim Odutola on the questioned documents: **'Q1' and 'Q2': Branch Expectations letter with Five numbered statements 'Q1' is the purported signature of Tim Odutola and 'Q2' is the handwritten date of 11/6/2015 at the top right of the page. 'Q3' and 'Q4': Progress Update Sheet with a typed date on top right corner of 03/07/2016. 'Q3' is the handwritten date at the bottom, which appears the number 6 was altered into the number 8: 3/8/16 and 'Q4' is the purported initials of Tim Odutola on the bottom right of the page.**

An examination of handwriting includes establishing patterns of writing habits to help identify the author. Handwriting is formed by repeated habits of writing by the author, which are created by neuro-pathways established in the brain. These neuro-pathways control muscular and nerve movement for writing, whether the writing done is by the hand, foot or mouth.

In support of my opinion, I have included an excerpt from *Handwriting Identification, Facts and Fundamentals* by Roy A. Huber and A.M. Headrick (CRC Press LLC, 1999, pp 50-51) wherein the leading forefathers of document examination in the USA agree that one significant difference in the fundamental structure of a writing compared to another is enough to preclude common authorship:

> [Ordway] Hilton stated: "It is basic axiom of identification in document problems that a limited number of basic differences, even in the face of numerous strong similarities, are controlling and accurately establish nonidentity."

> [Wilson R.] Harrison made similar comments: "...the fundamental rule which admits of no exception when handwritings are being compared...is simple – whatever features two

> specimens of handwriting may have in common, they cannot be considered to be of common authorship if they display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of reasonable explanation."
>
> [James V.P.] Conway expressed the same theme when he wrote: "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person."

and finally,

> [Albert S.] Osborn and others have generally agreed that despite numerous similarities in two sets of writings, a conclusion of identity cannot be made if there is one or more differences in fundamental features of the writings.

The techniques promulgated by the scientific community in the forensic document examination field generate reliable results and are generally accepted.

Based upon thorough analysis of these items, and from an application of accepted forensic document examination tools, principles and techniques, it is my professional expert opinion that **a different person authored the name and initials of Tim Odutola the 2 handwritten dates on the questioned documents. Someone did indeed forge the initials and signature of Tim Odutola and the 2 handwritten dates on the questioned documents, 'Q1', 'Q2', 'Q3' and 'Q4'. Tim Odutola did NOT print the 2 handwritten dates, did NOT sign his name and did NOT author his initials on 'Q1' through 'Q4'.**

I am willing to testify to this fact in a court of law and I will provide exhibits to the Court showing that I had sufficient data and that my opinion is correct. My Curriculum Vitae is attached and incorporated herein by reference.

Respectfully submitted,

Curt Baggett

Curt Baggett

The above Letter of Opinion was sworn and subscribed before me by Curt Baggett this 23rd day of September, 2021.

State of Texas §
§
§
County of Dallas §

Patricia J. Hale

Notary Public – State of Texas

# LEGAL DATA

## UNITED STATES v. JANET L. THORNTON

*Case No. 02-M-9150-01, decided January 24, 2003*

This issue is governed by Fed.R.Evid. 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [This rule was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) and *Kumho Tire Co. Ltd. v. Carmichael* (1999).]

In *Daubert*, the court, focusing on the admissibility of scientific expert testimony, held that the trial judge has the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. In *Kumho Tire*, the court held that a trial judge's gatekeeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge.

Among the studies cited by Mr. Hammond is a study by Professor Sargur Srihari on the individuality of handwriting. Using handwriting of 1500 individuals, his conclusions were that, using computer software, they were able to establish with a 98% confidence that the writer can be identified. Taking the results over the entire population, they were able to validate handwriting individuality with a 96% confidence. By considering finer features, Professor Srihari opined that they should be able to validate handwriting individuality with a near 100% confidence. A study by Dr. Moshe Kam indicates that professional document examiners had only a 6.5% error rate compared to an error rate of 38.3% for nonprofessionals. Dr. Kam concluded by stating that professional document examiners possess writer identification skills absent in the general population. Another study by Professor Kam indicated that professionals concluded that forgeries were genuine 0.49% of the time whereas laypersons did so 6.47% of the time. Professionals mistakenly concluded that genuine signatories were forgeries 7.05% of the time; laypersons did so 26.1% of the time. Another study by Jodi Sita, Brian Found and others found that forensic document examiners made errors in 3.4% of their opinions, while 19.1% of the control group gave erroneous opinions.

The above studies provide solid evidence that handwriting individuality can be validated with a very high degree of confidence, and that professional forensic document examiners have developed an expertise and training that allow them to correctly identify a person's handwriting with a much lower error rate than laypersons. On the other hand, the affidavit of Dr. Saks raises legitimate questions concerning the validity of these studies and the accuracy of handwriting identification in general.

However, in *Daubert*, the U.S. Supreme Court made it clear that "it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty; arguably, there are no certainties in science. . . . Science . . . represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." It is sufficient if the proposed testimony can be supported by appropriate validation, i.e., good grounds, based on what is known.

5/21 (O.M.O)

Forged date & Keya Briscoe handwriting

★ Keya Briscoe ★ Forger's handwriting (please match with the other two exhibits)

11/6/2015

QDE Exhibit Q2

<u>Branch Expectations</u>

1. Vacation should be given 3 weeks in advance. Subject to management approval and AOO approval.

2. Doctor visits should be given 3weeks in advance with adequate staffing. Mondays and Fridays, no appointments should be scheduled, if at all possible. Subject to management approval.

3. If you are going to be late please text or call management no later than 15 min before scheduled time.

4. If you are sick please call management after 7:00 am or an hour before your start time. Please ensure that ALL duties have been communicated to the proper person.

5. If you need to leave early or come in late, please notify manager as soon as possible, even if management is not in the office. This will be subject to management approval. If possible, please find coverage. This will be your responsibility.

[signature]

5/21 photocopied (O.M.O)

QDE Exhibit Q1

Depo #3

# Progress Update Sheet

(based on steps of formal coaching)

Printed date (O.MO) 5/21

**Name: Tim Odutola** **Date: 03/07/2016**

Progress and follow up on action plan since last session: (step 2)

This is a verbal warning. On 11/06/2015, it was communicated to Tim that if an associate was sick, they would need to call management after 7:00am or an hour before there start time and let management know the situation. However, on 03/07/2016 Tim texted ML at 5:10am and said that he was sick and was not coming in. Tim did not follow the proper procedures as to notify management.

Focus Area: (step 4)

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Going forward Tim should **call** management after 7:00am or an hour before start time and inform management of illness. If Tim fails to do so, this could result in an unexcused absence.

Create Action Plan : (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.:

Going forward Tim should follow the procedures of the branch and BB&T. It is not acceptable to send a text to your ML stating that you are sick. The proper procedure is to call management and if needed, discuss any arrangements with associates and clients that might need to take place.

QDE Exhibit Q3

QDE Exhibit Q4

* Keeya Briscoe *
The forger's handwriting
(please match the two)

Altered date

photocopied (O.M.O)

(Initials) Mgr. RB Empl. ______ Date 3/8/16.

Depo #10

(O.M.O) Keeya Briscoe handwriting 5/21

(O.M.O) 5/21 Forged date and altered 6 to an 8 to – Keeya Briscoe... match print date

Odutola v. BB&T
000262
CONFIDENTIAL

# Progress Update Sheet

(based on steps of formal coaching)

**Name: Tim Odutola** **Date: 12/04/2015**

**Progress and follow up on action plan since last session**: (step 2)

It is regional decision that temporary debit cards should only be issued to clients that have established an account for 12 months or more.

**Focus Area for month**: (step 4)

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Tim was aware of this and on 11-30-2015 he opened a new account for a client and gave the client a temporary debit card. The client deposited a check for $880.00 and it was returned. The account is negative $-55.50, due to ATM fees and NSF fee.

**Create Action Plan for month**: (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.:

This document stands as a verbal warning. Tim will only give temporary cards to clients that have established an account for 12 months or more.

12-4-15

QDE Exhibit K1

[Coach's Support]

_____If Tim has any questions or concerns regarding this regional policy he can direct them to management.

(Initials) Mgr. KB Empl. T.O Date 12-4-15

Odutola v. BB&T
000258
CONFIDENTIAL

Depo [illegible]



Branch Banking and Trust Company
INTER-BRANCH CORRESPONDENCE

From: Keeya Briscoe

To: Tim Odutola

Re: Written Warning- Sercurity Violation/ Exposed Cash

**SUBJECT OF WARNING**: On Friday, February 18th, during your shift you failed to secure all of your cash at the teller window. When leaving your teller window, you must lock all drawers and log off your computer, even if you are just stepping away to use the counter or putting money away in the vault.

As a Branch Banker, you have been trained in policy and procedures for securing cash, maintaining sole control of your cash, and ensuring that your station drawers are empty, coin vaults locked and cash drawer secured in the vault prior to leaving area. The BOM, section C307, states "Each Teller/BB must keep sole control of his/her cash fund at all times". The unsecured, exposed cash was a potential loss to the bank and exposed your teammates to speculation had the money disappeared.

It is the bank's expectation that you secure all cash, coin, etc. before leaving each day or at any time that you cannot be directly with your assigned cash.

This written warning is to ensure you know the importance of securing all cash. I am available to provide you with additional guidance in the performance of your job. Should you have any questions about this written warning or about my expectations of your performance, please let me know. You should be aware that further related performance deficiencies could lead to further disciplinary action, up to and including termination of your employment.

This written warning will be placed in your file as a reminder of your responsibility to protect the bank from loss by following policy and procedures when securing your cash and coin.

Associate Comments:

________________________________________

________________________________________

________________________________________

The above has been discussed with me by my supervisor and I understand that a copy of this memorandum will be placed in my personnel file. I also understand that any further performance issues will result in further disciplinary action up to and including termination of my employment.

[signature] 3/24/16
Associate Date

[signature] 3/24/16
Market Leader Date

3-24-16
QDE
Exhibit
K2

Odutola v. BB&T
000292
CONFIDENTIAL

Depo E, 12



Branch Banking and Trust Company
INTER-BRANCH CORRESPONDENCE

From: Keeya Briscoe To: Tim Odutola

Re: Final Written Warning – Exposed Cash

**SUBJECT OF Final Written Warning**: You were given a Written Warning on February 18th for exposure of cash. On Friday, April 8, 2016 during your shift you failed to secure your cash at the teller window. As a Branch Banker, you have been trained in policy and procedures for securing cash, maintaining sole control of your cash, and ensuring that your station drawers are empty, coin vaults locked and cash drawer secured in the vault prior to leaving or walking away.The BOM, section C307, states "Each BB must keep sole control of his/her cash fund at all times". The unsecured exposed cash was a potential loss to the bank and exposed your teammates to speculation had the money disappeared.

It is the bank's expectation that you secure all cash, coin, etc. before leaving each day or at any time that you cannot be directly with your assigned cash.

Tim , this is a Final Written Warning is to ensure you know the importance of securing all cash and keys prior to leaving for the day. I am available to provide you with additional guidance in the performance of your job. Should you have any questions about this written warning or about my expectations of your performance, please let me know. You should be aware that further related performance deficiencies could lead to further disciplinary action, up to and including termination of your employment.

This Final Written Warning will be placed in your file as a reminder of your responsibility to protect the bank from loss by following policy and procedures when securing your cash and coin.

Associate Comments:

________________________________________

________________________________________

________________________________________

The above has been discussed with me by my supervisor and I understand that a copy of this memorandum will be placed in my personnel file. I also understand that any further performance issues will result in further disciplinary action up to and including termination of my employment.

[signature] 4/15/16 [signature: Keeya Briscoe] 4/15/16

Associate Date Market Leader Date

4-15-16
QDE
Exhibit
K3

Odutola v. BB&T
000294
CONFIDENTIAL



**Operations**
**Know Show Grow**

Tim Odutola — Associate Name

Sept. 16, 2016 — Date

- Know:
  You have displayed operational issue relating to you performing your teller responsibilities.
  - Numerous proof corrections (previously). More recently shredding important documents, such as official checks & teller/client transactions.
  Operational efficiency is very important to your role & the responsibilities of the bank.
- Show
  - required to be behind teller line at least 1 hour a day.
  - Reach out to branch info for assistant
  - use your resources ie. AOO - Delores, Wake tha
  - Slow down, pay attention to detail,
  - Pay attention to what you trash
- Grow
  - → will commit to being hour on the teller 1 hour a day
  - → Have Delores look at work before scan
  - → Slow down & pay attention to detail
  - → use my resources.

T.M.O — Associate Initials

[signature] — Market Leader Initials

[signature] — AOO Initials

Note: A copy to be maintained by Market Leader and AOO.

9-16-16
QDE Exhibit K4

Depo 20

# Progress Update Sheet

**Name: Tim Odutola** **Date: 10/12/2016**

**Action plan** :

This is a verbal warning regarding signature cards in the month of September. You had 2 outstanding signature cards that have been outstanding for over 30 days. All signature cards should be scanned at account opening. If you get a scan error, then you should follow the procedures that are in place. Remember that if you have to send a signature card down you need to get AOO approval.

**Focus Area for month**: (step 4)

Based on your preparation from reports, list focus for immediate improvement and additional focus areas for month.

Signature cards are very important because they help detect fraud and this is the only way we can determine that the client authorized the account. All signatures must be signed by clients at account opening or within 7 days of account opening. Failure to do so can cause the account to be blocked and this can impact the client.

**Create Action Plan for month**: (step 5)

Use focus areas from above, add details (how much, of what, by when), and include your interaction/support.:

Going forward you must adhere to this operational procedure. Failure to do so can result in further disciplinary action.

10-12-16
QDE
Exhibit
K5

(Initials) Mgr. KB Empl. [signature] Date 10/12/16

Odutola v. BB&T
000298
CONFIDENTIAL



Exhibit #14

The original video footage will show the way the defendant fabricated and altered evidence.

Bad faith litigation, misconduct and fraud

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Front Door
10/14/2016 10:56:04 AM (Eastern Daylight Time)

Timestamp →

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

* Photos redacted, edited and omitted. (the defendant changed the time sequence and redacted photos and tampered with evidence)

⟹ * Defendant claims to not have the video but has snap shots and images that they altered and edited. There is no way possible to have snap shots and not the "actual" video. They purposely withheld evidence because they wanted to surpress the truth.

Depo 35

→ FOIA provided the actual video footage to me and my counsel after the deposition that they got from the defendant.

↙ BB number

Odutola v. BB&T
000493
CONFIDENTIAL

# 15

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Front Door
10/14/2016 10:54:52 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000494
CONFIDENTIAL

EXHIBIT #16

* All timestamps of the images are off.
* Incorrect sequence of events presented / not included redacted images 6 — 6(3)

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 4
10/14/2016 10:55:48 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

EXHIBIT # 17

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 4
10/14/2016 10:55:46 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Exh #18

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 4
10/14/2016 10:55:46 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000497
CONFIDENTIAL

EXH # 19

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 4
10/14/2016 10:55:38 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000498
CONFIDENTIAL

Ex 4 # 22

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 3
10/14/2016 10:55:34 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000499
CONFIDENTIAL

Ex. 4 #21 Case 1:21-cv-03212-RBW Document 1 Filed 12/08/21 Page 56 of 76

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller 3
10/14/2016 10:55:33 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000500
CONFIDENTIAL

Exh #22

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:55:31 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000501
CONFIDENTIAL

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:54:05 AM (Eastern Daylight Time)



Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000502
CONFIDENTIAL

Exh # 34

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:56:02 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000503
CONFIDENTIAL

Exh 25

<u>**Digital Video Snapshot**</u>
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Front Door
10/14/2016 10:55:33 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Odutola v. BB&T
000504
CONFIDENTIAL

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:55:32 AM (Eastern Daylight Time)



Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881



Odutola v. BB&T
000505
CONFIDENTIAL

Exhibit (#) # 27

Out of sequence.

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:55:28 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

Exh # 28

**Digital Video Snapshot**
Site: DC/Washington- Capitol Hill 8881- 2612209
Camera Name: Teller Overview 2
10/14/2016 10:55:54 AM (Eastern Daylight Time)

Capture Size: 704 x 480 pixels
Device Network Name: MNAR1433V495
Device Serial Number: AR1433V495
Device Station ID: N338881

* ALL of the images were out of time sequence and put in an order favorable to the defense. The page numbers show that they purposely put them in that order to perpetrate a fabricated sequence of events contrary to the actual video footage. They omitted and redacted footage while concealing the actual video.

Odutola v. BB&T
000507
CONFIDENTIAL

THE REPORTER: Personal, what?

THE WITNESS: Inflictions.

(DEF.) MR. FLOYD: I do not have the video, but I do have these snapshots, and I don't know how they -- I don't know how these came to us. I don't know if we have video or not.

(RUDASIL) MR. RUDASILL: Surveillance cameras.

(DEF.) MR. FLOYD: Yeah. And I don't know where these came from. And I -- and, James --

MR. RUDASILL: The surveillance cameras at the bank.

(DEF) MR. FLOYD: Yeah, I mean, I know they came from the camera, but I'm not sure how we have the stills. But I don't know if we have the video. But I think I told you I came to this case like you, sort of late in the game. And I have to ask. But they are, you know, what they are.

(Exhibit 35 was marked for identification and is attached to the transcript.)

BY MR. FLOYD:

Q So let's just go through them sort of piece by piece, and what I want to do is have you identify

A Yes.

Q All right. And then the next picture it looks like the back of somebody with a dark suit --

A Yeah, that's me.

Q -- black man -- that's you?

A Uh-huh.

Q Okay. And are you on the way -- it looks like you're on the way out at this point, right, because otherwise you're walking backwards?

A I don't know, because I walked to the back of the teller line to the very back. I don't know if this is when I came in and I was going --

Q When were you -- what bay were you working at?

A I was working at this one.

Q The first one right there at the door?

A Yeah. So I don't know if this is when I came back in or I don't know if this is when I was going out.

(Rudasil) MR. RUDASILL: Based on the time stamp sequence on the pictures, this is at 10:55:31 and 14. Yeah, the sequence are backwards.

(DEF)

intention to deceive another person.

Exhibit T

(ME) → THE WITNESS: Yeah, that's what I'm saying. ←

(DEF) Q So you haven't gone out yet because then you've got ten -- I see clear pictures of you out at 10:55:46, right, which is later. So James is right and they're going from later to earlier. ↖

Done intentionally → (ME) → A Yeah. (verbally admitted)

Q And what is that that you have in your hand there?

A Where, in the window?

Q Yeah.

A I think that's the check.

Q That's what you have in your hand there?

A Yeah. The check. I had the check and the ID.

Q What's in your other hand, your right hand?

A It had to be the check or the ID, because he gave it to me like this and I had it like that. And that's either when I gave it back to him or when I took it and asked him.

Q Okay. So you have the check in one hand then something else, it looks like, bigger in the other hand.

* Fabricating and altering evidence.
* Tampering with evidence with intent to mislead.

you were saying, right?

A Yes.

Q I mean, there's no question she's right there?

A She heard -- and she heard the guy say it.

Q And it looks to me at 10:56 you're back behind the teller line.

A Yes.

Q I mean, did you come out behind the teller line? Is that what they call that?

A Yes.

Q And I don't know what you're saying there but --

(ME) A I was looking in disbelief. (misrepresentation)

(DEF) Q And then 10:55:33, so that picture is sort of way out of sequence, I guess. And then so then we're back to -- 10:55:33 both Keeya and Wakettia are there confronting the guy, right?

DEF

A 10:55:33, okay.

Q So at 10:54, we just see Wakettia. At 10:54 we can see Wakettia. But at 10:55:48, 46, 46, 38, 34, 33 -- that's a different picture at 10:50. So

Exhibit #34

we had two shots of 10:55:33 from different angles and she's out there, right?

A The tail end, yes.

THE REPORTER: I'm sorry?

THE WITNESS: I'm sorry, at the tail end, yes.

Q Seems pretty early to me?

A Nah.

Q And at 10:55:32 you're on your way out the door, then, right? 10:55:32.

MR. RUDASILL: It looks like Wakettia was the first one out.

THE WITNESS: Yeah, she was.

Q But Keeya is out there by the time -- you're on your way out the door at 10:55:32, which is No. 505. You're on your way out the door, and a second later, you know, it doesn't show you out the door yet but does show that Keeya is standing there with Wakettia?

ME → (ME) A That's not accurate.

(DEF) Q It isn't? What's not accurate about it?

(ME) A That's not accurate.

* Intentionally misrepresented video clips knowingly to deceive Plaintiff. Defendant knew we had not seen video yet.

(DEF) Q What do you think, this has been fraudulently dated and time changed or something?

← using gamesmanship to subvert the truth

(ME) A That's not accurate because it -- nah.

(DEF) Q Looks to me that's what's going on. You can correct me if you want, but that's what it looks to me. I think that this could be solved more readily with the video if you get a chance to get that.

Knows they are fradulently represented

ME → (ME) A These are chopped up and out of sequence.

(DEF) Q But even when we look at them in sequence, the timing, it shows that Keeya is there early even before you're out?

A Uh-huh.

(DEF) Q Even before you're out from behind there, which you claim you were going out to get your manager. Your manager is already standing there talking to the suspect?

(ME) A No. She came -- she clearly came at the end. I saw her when she came out the office.

(DEF) Q It's not clear in those video pictures.

(ME) A That's what I said, I want to see the video. These are pictures. I mean, this was just pictures with dates on them. I don't -- and if that's the



EXHIBIT 57

Tim Odutola <timodutola@gmail.com>

# Docs REVIEW

9 messages

**Tim Odutola** <timodutola@gmail.com> Mon, Apr 29, 2019 at 7:18 PM
To: "Jackie T. Meier, Esq." <jmeier@meier-law.com>

Jackie,

I was able to briefly look over the documents today while I was printing them all out.

I was very disappointed in what they sent me. They sent a complete waste of stuff. They omitted all pertinent information and provided pseudo documents to make me look bad or try at least. The performance reports had changed dates on them and they didn't send the actual data showing my performance. The pictures are off and not in order and missing parts (done on purpose) To say the least they honestly believe and think that I am as dumb as them if they think that I would accept this. I have never been humiliated like this before. Jackie, as you know this is the most important part of my case. There is No way that this should occur.

I will go through the documents between tonight and wed when we get the rest. I am 100% sure that we will be DEMANDING more docs and I WILL BE SPECIFIC. Whatever we need to do to get the right info needs to done before we discuss a deposition date.

Again, I will take a closer look and find what is missing over the next few days. I sincerely look forward to speaking with you by Wednesday.

Have a good evening.

**Jackie T. Meier, Esq.** <jmeier@meier-law.com> Tue, Apr 30, 2019 at 7:50 AM
To: Tim Odutola <timodutola@gmail.com>

Tim,

[redacted]

I already gave them the dates you told me on Friday you were free for a deposition. I can tell them you're no longer free those days, but then they'll just subpoena you, and don't count on them producing any more documents promptly or without some effort. Also, keep in mind you have an obligation to be deposed, if they wish to depose you. It's not your choice. And hopefully they will depose you because it will give you a chance to tell some of your story.

As I said before, you won't be getting documents on Wednesday. They agreed to produce documents around Wednesday. Then it will take time for me to get them and then for you to get them.

PS. You didn't tell me you had so many unfavorable reviews. That's not exactly making my job easier! And I did previously suggest we try to settle the case. Recall you didn't want to...

Regards,

Jackie T. Meier, Esq.
The Meier Law Firm
1101 Connecticut Ave., NW
Suite 450
Washington, DC 20036
Tel.: (202) 450-7466
www.meier-law.com

[Quoted text hidden]

**Tim Odutola** <timodutola@gmail.com> Tue, Apr 30, 2019 at 10:44 AM
To: "Jackie T. Meier, Esq." <jmeier@meier-law.com>

EXHIBIT 58

# THE MEIER LAW FIRM

Jackie T. Meier- Attorney
1101 Connecticut Ave., NW, Suite 450
Washington, DC 20036
Tel. (202) 450-7466
jmeier@meier-law.com
www.meier-law.com

*By E-mail and U.S. Mail*

Oluwarotimi Odutola
4908 Georgia Avenue, NW
Washington, DC 20011

*By email to* timodutola@gmail.com

December 10, 2019

Re: *The Meier Law Firm v. Oluwarotimi Odutola*
D.C. Superior Court Case No.: 2019 SC3 005579

Mr. Odutola:

Please find enclosed a copy of Judge Rahkel Bouchet's December 3, 2019, Order in this case, awarding Plaintiff The Meier Law Firm $9,133.79 in the above-captioned case.

Additionally, as the Order states, Plaintiff is entitled to interest and costs. Plaintiff's costs in this case are $408.57, and interest is accruing from December 3, 2019 at the statutory rate of 2% per annum. Thus, the total amount you owe Plaintiff is currently $9,542.36.

Please contact me immediately to arrange payment of the $9,133.79 judgment, interest and costs, by check made out to The Meier Law Firm or to Jackie T. Meier, Esq., at the above address. Thank you very much.

Very truly yours,

Jackie T. Meier

Jackie T. Meier, Esq.

Encl.

Ex 42B at 52

**Gabriela Romo, LCPC**
Licensed Clinical Professional Counselor

Gabriela Romo, LCPC
4445 Willard Ave, Suite 600
Chevy Chase, MD 20815

March 22nd 2019

To Whom It May Concern:

I, Gabriela Romo, as Licensed Clinical Professional Counselor in the State of Maryland (license LC6800), hereby inform that Mr. Odutola Oluwarotim (DOB: 03/18/1985) received mental health counseling from me on February 13th 2019 for an hour. At that time, he was diagnosed with F43.10 Posttraumatic Stress Disorder (F4310).

If you have any questions, please do not hesitate to contact me at 202-320-4601 or at gaby@gabrielaromo.com

Kind regards,

Gabriela Romo
Licensed Clinical Professional Counselor
Approved Clinical Supervisor
LC6800

**Clients' Names: Oluwarotim Odutola**          **Session 1**          **Date: 02/13/2019 9.00 am**

**Demographics:**

Client is black American from African background, 33 years old, single, tall, and works as personal wealth management for a private Bank. He lives in NW Washington, DC.

**Subjective:**

Client reported to be seeking counseling to deal with symptoms of PTSD, anxiety, depression, and feeling paranoid. He takes clonazepam for anxiety since he was diagnosed in June 2018 by Psychiatrist Dr. Radu. He explained that ever since he had problems in his previous job, he developed these diagnoses. The work related problems included feeling discriminated by his supervisor at the beginning which led to working in a hostile environment and repetitive confrontations with her. He also described incidents in which his supervisor attempted to get him fired and arguments with her because he refused to break rules and corporate policies. Moreover, he reported an incident where a customer threatened to kill him, in which his supervisor was not supportive, did not allow him to get off work earlier, and prevented him to report the incident to the police. Although eventually he reported it, client expressed he felt powerless and fearful, making him to believe that probably his supervisor was behind it. Client reported that he then made several attempts to report his supervisor's treatment to HR without any success. Client was fired in November, after being in admin leave. In the meantime, his bank account got frozen, got delayed in his financial responsibilities (e.g., rent), landlord sued him, eventually became homeless, and developed symptoms of anxiety and depression. He described ongoing symptoms including avoidance, arousal, cognitive and mood changes. Client lacks emotional support in part because he disclosed feeling ashamed with his family and friends for the problems at work and its consequences, avoiding conversations, people, and activities. Client reported that he has a new job but his mental health is impairing him to function well, as he is sleep deprived, anxious, and mistrustful. This is turn serves as a reminder of the stressful situation at work and how things developed. Client said that he has already met with a lawyer to explore suing. Overall, client said that he finds difficulty in trusting people, his self esteem got damaged, and often he has repeated memories of the incidents described, feeling very distressed and upset. He worries about his professional career and his mental health.

**Objective:**

The client arrived a few minutes before his scheduled session. As interviewed during the session, he was lucid, oriented, and made good eye contact. His general appearance was good, he was well dressed in a business attire. His speech, motor activity, intellect, and judgment were normal. He spoke in a normal tone of voice, was cooperative in his responses and his posture was normal. His mood was nervous and anxious and his affect was consistent. Client was suggested to continue meeting with his psychiatrist and offered to do tele mental health counseling sessions if meeting in person was challenging for him. At the time of the interview he denied having suicidal ideation, visual or auditory hallucinations and denied any past history of mental health disorders.

**Assessment:**

Client seems to have been negatively affected by the relationship with his former supervisor, the hostile environment, and death threat that took place in his workplace. These events led to getting in debt, losing his job, and becoming homeless. Lacking resources, support, and coping mechanisms to manage the stress and the traumatic experience, client developed post trauma and low-mood related symptoms. He evidenced having difficulty on dealing with shame and fear. He mistrusts others, is guarded, and fears to be victim of other similar incidents. He meets the criteria of the diagnosis of Posttraumatic Stress Disorder. In re to Depression, insufficient information was provided to make a formal diagnosis of current symptoms.

**Plan:**

Action plan: No session was scheduled for next visit yet. Continue evaluating client, building rapport and trust. Provide tools to ease symptoms. Trauma-Informed Approach.

Gabriela Romo
Licensed Clinical Professional Counselor, (LC6800)

EXHIBIT 54

June 5, 2018

Mr. Oluwarotimi M. Odutola
4908 Georgia Avenue, NW
Washington DC 20011

Dear Mr. Odutola:

This letter is in response to your request for information in your file with COPE, Inc., an Employee Assistance Program (EAP) provider in Washington DC.

You were referred to COPE, Inc. by MHN, the behavioral health subsidiary of Health Net, Inc. MHN is the EAP for your former employer BB&T. MHN contacted COPE to request affiliate services for you under authorization code 14362280. COPE was authorized to see you for three sessions.

You voluntarily contacted COPE, Inc. on 10/21/2016, requesting an appointment to address anxiety, feelings of paranoia and trouble sleeping. An appointment was scheduled for November 11, 2016 by which time COPE had received the necessary paperwork and authorization from MHN to proceed. During the initial session, you reported attending the EAP due to a conflict with your manager and having been placed on administrative leave without an explanation.

You reported that you had been working at the same BB&T branch location for approximately one year and for the same supervisor. Further, although you maintained a professional relationship with your supervisor, you felt her behavior towards you was inappropriate and intrusive. Specifically, she asked many questions about your personal and love life which did not seem relevant to the job. Despite the discomfort you felt from her probing questions, you reported that you had been a top performer at the bank and got along with your colleagues and customers.

On or around the end of October, 2016, you described a situation in which this supervisor sent you to another branch to help out. Despite company policy that requires more than one employee to be onsite, you were told, by your supervisor, to return to your branch. You defied her request by complying with this company policy. You said you felt you were intentionally placed in this compromising situation by your supervisor.

Several days later, an angry bank customer threatened to follow you home and kill you. You felt your supervisor failed to provide the support you needed when filing a report about this incident. Nor did you feel supported by the Human Resources department. You reported that shortly thereafter you were placed on leave without an explanation. It was at this time that you felt it necessary to contact a lawyer and began to experience symptoms of depression, sadness, low energy, anger, panic attacks and the inability to sleep.

Scanned by CamScanner

EXHIBIT 55

You attended the following sessions at COPE using your MHN health insurance to address the emotional and professional impact of being placed on leave:

- November 1, 2016
- November 8, 2016
- November 15, 2016

At the end of the three authorized sessions, COPE provided four referrals to area therapists so that you could continue to receive support. On November 29th, the COPE counselor followed-up with you. You responded by email on December 2, and stated that your job had been terminated. You stated you were angry that you were unable to get unemployment benefits, which hindered your ability to seek further counseling as COPE had recommended.

You received the standard EAP assessment, supportive counseling, and follow-up services. This summary letter reflects the notes taken by the counselor to whom you were assigned at COPE.

Please contact me if you have any further questions at 202-628-5100.

Sincerely,

Helene W King

Helene W. King Ph.D.

Scanned by CamScanner

EXHIBIT 50

(citing *Ramirez v. Dep't of Justice*, 680 F.Supp.2d 208, 210 (D.D.C. 2010)) (explaining that prejudice requires "the movant [to] show that the misconduct foreclosed full and fair preparation or presentation of its case" (internal quotation marks omitted)).

Here, Plaintiff fails to demonstrate how Defendant's counsel in anyway engaged in fraud, misrepresentation, or misconduct that resulted in Plaintiff's failure to appear for a scheduling hearing or respond to the Court's Order to Show Cause. Rather, Plaintiff spends many pages making unsupported, outrageous and untrue allegations concerning Defendant's and Defendant's counsel's conduct during the course of discovery and Plaintiff's deposition, which has no bearing whatsoever on his failure to appear for a status conference, failure to respond to a motion to show cause, or even his failure generally to prosecute his case.

DEF. →

Plaintiff makes numerous false claims of fraud, misrepresentation, fabrication or alteration and/or forgery of documents against Defendant and Defendant's counsel. Indeed, Plaintiff goes so far as to allege that he had certain documents and video evidence examined by a forensic examiner, but he failed to provide any report or evidence of these findings. Despite the false and outrageous nature of Plaintiff's allegations, he also failed to provide a single supporting affidavit. These serious and false allegation are all without a single shred of evidence or other support beyond Plaintiff's on speculation, conspiracy theories and conjecture. *See Walsh*, 10 F.Supp.3d 15, 20 (denying Rule 60(b)(3) relief where plaintiff failed to present clear and convincing evidence of misconduct and relied on conjecture and unsupported assertions).

→ DEF.

Furthermore, Plaintiff fails to show actual prejudice. There is no indication that Defendant's or Defendant's counsel's statements, even if false, prevented Plaintiff from developing his case fully and fairly, or more importantly, attending court-ordered conferences or responding to the Court's Orders. Plaintiff has not been a passive participant in this case. Indeed